FILED

2006 Mar-28  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CHARLES ANWAH, CHARLES
BURSE, and ALFONZA HOLT,

      Plaintiffs,

vs.                                                    CASE NO. CV-05-J-361-S

JRHBW REALTY, INC. d/b/a
REALTYSOUTH,

      Defendant.

## <u>MEMORANDUM OPINION</u>

Pending before the court is the defendant's motion for summary judgment (doc. 24), evidence in support of said motion and a memorandum of law (docs. 25 and 28). The plaintiffs filed a response and evidence (docs. 31 and 32) and the defendant thereafter submitted a reply (doc. 34).

Plaintiffs commenced this action by filing a complaint alleging defendant JRHBW Realty, Inc. ("RealtySouth") discriminated against them on the basis of race (black) in violation of the Civil Rights Act, 42 U.S.C. § 1981; and the Fair Housing Act of 1968, 42 U.S.C. §§ 3605(a) and 3606. The plaintiffs also state a claim under state law for the tort of outrage.[1]

---

[1]Other claims of the plaintiffs were dismissed on April 7, 2005, for failure to state a claim upon which relief could be granted (doc. 9).

The plaintiffs are real estate agents, each working as a sales associate with the defendant in its Trussville Crossings office.  Complaint, ¶ 6.  The plaintiffs assert that, despite inquiries about promotions, they have not been allowed the opportunity to advance with the defendant.  *Id.*, ¶ 10.  The plaintiffs further assert that they have not been allowed the opportunity to sell real estate in any of the defendant's sixty-five new construction subdivisions.  *Id.*, ¶ 12.  The plaintiffs allege that they have been denied this opportunity because they are black, and the new construction subdivisions are being sold mainly to white buyers.  *Id.*, ¶¶ 12-14.  Furthermore, plaintiffs allege that the defendant's policies, patterns and practices deny black potential home purchasers access to housing in areas which are inhabited primarily by white residents.[2]  *Id.*, ¶ 14.

Upon consideration of the pleadings, memorandum of the defendants and evidentiary submissions, the court concludes that the motion for summary judgment is due to be granted as no genuine issues of material fact remain and the defendant is entitled to judgment in its favor as a matter of law.

## FACTUAL BACKGROUND

In the light most favorable to the plaintiffs, the court finds the facts of this case to be as follows:

---

[2]In ruling on the motion to dismiss, the Court held that no black home purchasers were properly before it, and that the plaintiffs, as real estate agents, could not sue for vindication of potential home buyers' rights.  Therefore, any claims based on the rights of non-parties to the suit were dismissed.  *See* doc. 9, at 3-6.

The parties do not dispute that each of the plaintiffs is an independent contractor, and that no employee/employer relationship exists between the plaintiffs and defendant. *See e.g.*, Holt depo. at 59, 98.  Each of the plaintiffs works at the defendant's Trussville Crossings location and their broker is Mary Richmond. Richmond depo. at 8; Holt depo. at 12-13; Burse depo. at 45, 50-51; Anwah depo. at 17, 43.  Richmond has been the broker at that office since January 1990, which was prior to a previous company being merged with the defendant.  Richmond depo. at 9; Anwah depo. at 43.

The defendant does not develop any subdivisions itself.  Richmond depo. at 46. Rather, the defendant is usually associated with new developments through agents. *Id*., at 47.  In one case, three agents teamed up to find builders for a developer.  *Id*., at 55-58.  Each of the agents brought in builders to buy the lots and then sold the houses built on those lots.  *Id*., at 58-59.  On another occasion, a developer told Richmond that he had eighteen lots he wanted to sell.  *Id*., at 61.  Richmond "put out the word in the office that anybody who had anybody that wanted to buy eighteen lots, you know, have at it." *Id*.  The agent who brought in a buyer for the lots is now the listing agent on the homes that were built there.  *Id*.  For another subdivision, Richmond was approached by a developer for a proposal.  *Id*., at 79-80.  Richmond announced to the office that anyone who could bring in a builder for that development would be on the sales team.  *Id*., at 80.

3

According to Richmond, the way new home developments get listed varies from one development to the next.  Usually, one agent will have a connection with a new home development, then choose other agents to help sell that development.  Richmond depo. at 62.  Because the agents are all independent contractors, the defendant has no policy as to how agents team up with each other.  *Id*., at 62-63.  According to Richmond, if agents want to be involved in new construction, they need to have connections to builders.  *Id*., at 71-72.

Regardless of with what office an agent affiliates, the agent can list or sell anywhere he or she wants.  Richmond depo. at 116-117; Holt depo. at 126.

**Plaintiff Holt**:

Plaintiff Holt has worked as an independent contractor for defendant since 1989, including prior experience with other real estate agencies acquired by defendant.[3]  Holt depo. at 9-10.  He has worked through defendant's Trussville Crossing office for the last four or five years.  *Id*., at 12.  The areas of town in which an agent sells are based on individual choice, and not based on any geographical limitation established by defendant.  *Id*., at 127-129.

Although plaintiff Holt has taken some courses in new home construction, he has always sold pre-existing homes.  Holt depo. at 33-34, 62-63.  He has never been

---

[3]Plaintiffs Holt and Burse work as a team to sell real estate.  Holt depo. at 120-121; Burse depo. at 26-27.  They also jointly established First Family Real Estate Development, L.L.C., through which they buy, restore, and resell property.  Holt depo. at 92-95; Burse depo. at 19-20, 43-45.

the listing agent on a new construction home sale.  *Id.*, at 64.  Holt asserts that defendant limits some agents from new construction sales listings in subdivisions and developments.[4]  *Id.*, at 128, 130-131.  He asserts that defendant "may be hired as a listing agency to list and sell property in a specific development."  *Id.*, at 130.  He asserts that a developer "would contact a specific agency like Realty South, and after contacting Realty South, they'll decide on a marketing plan that they'll utilize for that community they're advertising and then selecting who's going to be on the team to actually sell the property through Realty South, what agents will be on that team."[5]  *Id.*, at 132.

Specifically, plaintiff Holt complains about the Carrington Lakes subdivision, which is listed by a team of six or seven agents, all of whom are white.  Holt depo. at 137, 145.  He knows nothing of these individuals' background, training, or experience.  *Id.*, at 146.  He assumes that these agents were selected by the agency to be on that sales team.[6]  *Id.*, at 138. He speculates the broker, with possibly some input from the vice president determined who would be on a particular team for new home

---

[4]Plaintiff Holt makes no allegation that defendant prevents him from bringing prospective buyers to new home construction sites and selling buyers homes as a buyer's agent.  Rather, he complains that he has never been selected to be a listing agent in such a development.  Any agent can show and sell new homes in a subdivision.  Richmond depo. at 53-54.

[5]Plaintiff Holt asserts he lost income from not being able to list new homes, but has no evidence of this.  Holt depo. at 218-223.

[6]In his response to summary judgment, he argues that "not everyone who gets into the new home business does not have a special arrangement or relationship with someone to get on the team."  Plaintiffs' response, at 6.

sales.  *Id*., at 139.  He thinks Mary Richmond would be part of this process, but has no evidence of this.  *Id*., at 139-140.  Richmond states this is simply not accurate. Richmond depo. at 89.

Plaintiff Holt has no knowledge as to whether the developer has any role in deciding who would be on the sales team.  Holt depo. at 171.  He has no information about what criteria were used to select agents for the Carrington Lakes sales team. *Id*., at 140.  He has shown houses in this subdivision to prospective buyers.  *Id*., at 143.  Holt asked one of the listing agents to let him shadow her at the subdivision so he could gain knowledge about being on a team, but she told him that she did not have any control over letting him do that.  *Id*., at 155-157.

He also complains about the Ridgefield development, which is being listed by a team of four or five agents.  Holt depo. at 147-148.  He has no knowledge of the criteria used to select the listing agents, other than one individual had only been selling real estate for one or two years.  *Id*., at 149-152.  He does not know who decided which agents would be on this team.  *Id*., at 152.  Plaintiff Holt asked one of these agents if he could shadow him, and the other agent replied that he did not know him well enough to do that.  *Id*., at 157-158.  He has no evidence that the agents he wanted to shadow turned him down based on race.  *Id*., at 240-241.  Plaintiff Holt also admits that he has no evidence of Mary Richmond matching agents based on race with subdivisions due to preconceived notions about who would be purchasing the

6

homes in question. *Id*., at 230. Rather, he believes that because a builder or developer has say so on who is on a listing sales team, the defendant must have some input as well. *Id*., at 231.

Plaintiff Holt believes that within the previous six months, a process had been instituted for available positions on subdivision sales teams which included interviews. Holt depo. at 162. Two subdivisions in particular had utilized this process. *Id*., at 162-165. The fact that the developer was seeking agents to interview for sales teams at these developments was announced by his broker at a sales meeting. *Id*., at 165. Plaintiff Holt submitted a resume and interviewed with the developer for a position as a team member. *Id*., at 167.

The plaintiff states that when he first came to the Trussville Crossings office, he told Mary Richmond that he was interested in listing new home developments. Holt depo. at 173. She told him at some point that he needed to go find land and builders and that she would have something for him. *Id*., at 173-176, 178-179. He cannot recall speaking to anyone else at RealtySouth about new home listing opportunities. *Id*., at 179-180. According to Richmond, Holt "was usually the one that did all the most talking always. And he always wanted to be on new construction." Richmond depo. at 88. According to Richmond, she told him the same thing she told everyone else, which was "I'll keep it in mind. I don't have any to hand out ..." and "to keep their ears open." Richmond depo. at 89.

The plaintiff testified that he determined the lack of new home development listing opportunities was based on his race "after the initial, you know, time of going back and forth and talking with [Mary Richmond] and her coming back with the typical response that you go find land, you go get a builder was an indication that she didn't – that that's not told to everybody." Holt depo. at 181-182.  He then expanded on this answer as follows:

> After looking at all of the different subdivisions and the different developments and looking at all the agents that make up the different teams, specifically there in Carrington and other subdivisions that I mentioned, no minorities are participating in that process and no minorities are being given the opportunity to participate in that process, meaning no African-Americans are being able to participate in that process.
> At that point me consistently going to her and her saying find land and find a builder, the only thing that I can think of would be my race, my pigmentation on my skin.  We're just not on teams.  That's what brought me to the conclusion that it was strictly race.

*Id.*, at 183.  He has no idea if any other minority agents expressed a desire or in any way tried to be on the Carrington or Ridgefield teams.  *Id.*, at 185-186.  He has no evidence of anybody ever saying that he was not placed on a team because of his race. *Id.*, at 189.

This plaintiff further alleges that a letter he received from Jim Dye, Vice President of RealtySouth, helped him reach the conclusion that he was excluded from the sales teams in question because of race.  Holt depo. at 187.  The letter concerned

8

Holt being able to obtain his Certified Real Estate Broker's certification.[7]   *Id*., at 187, 192.  To obtain this designation, Holt has to have managerial experience.  *Id*., at 194.  He first asked Mary Richmond about additional training so he could get this certification.  *Id*., at 192.  She went to the vice-president, then told Holt to put his request in writing.  *Id*., at 192-193, 209-210.   Holt wrote a letter requesting that a managerial training program be created.  *Id*., at 194, 216; Exhibit 2 to Holt depo.  Jim Dye responded that defendant would not be creating such a program and that if he wanted that experience, he would need to go elsewhere.[8]   Holt depo. at 195.

Plaintiff Holt has no knowledge that such a program has ever been created at RealtySouth, but asserts that Shirley Webb and Katherine Reed were allowed to do exactly what he was told he could not do.  Holt depo. at 192, 195-196, 218.  However, Holt then states that the two of them are actually helping to train other agents, which he believes is in a similar management capacity.  *Id*., at 196.  He then states that they are not assisting with training to receive a broker's designation, but rather Mary

_____

[7]The plaintiff draws an analogy between being told by Jim Dye that if he wanted management experience, he would have to get a job elsewhere with a Hispanic man named Angel Torres who translated mortgages for the Hispanic community.  Holt depo. at 191, 203-204.  Mr. Torres is not a real estate agent and is employed by the corporate defendant as a "mortgage person."  Holt depo. at 204-205.  The plaintiff states this is evidence of opportunities being created for other people and not for him, even though he was not qualified for this and Mr. Torres was not a real estate agent.  Holt depo. at 205-206.

[8]Plaintiff Holt did take a class through RealtySouth which was part of the courses he needed to get his broker's license.  Holt depo. at 217.

Richmond "just gave them an opportunity to train other agents." *Id*., at 198. Katherine Reed was actually performing this function when plaintiff Holt arrived at the Trussville Crossings office, which was four or five years ago. *Id*. Shirley Webb starting assisting with training after Holt requested a managerial program, but he does not know how that came about. *Id*., at 198-199. Holt actually knows of no one who has been given managerial training or a training program for a broker's license by RealtySouth. *Id*., at 212-213.

**Charles Burse**:

Plaintiff Burse has been in the real estate business for fourteen years. Burse depo. at 13-14. The office he worked for merged with defendant approximately four years prior to this lawsuit. *Id*., at 15. Since the merger, he has always worked out of defendant's Trussville Crossings office. *Id*., at 45. He is an independent contractor for defendant. *Id*., at 18. He decided to work out of the Trussville Crossings office after receiving a letter from Mary Richmond, the broker at that office.[9] *Id*., at 50-51.

Plaintiff Burse has sold new home construction as a selling agent, and as a listing agent on one occasion. Burse depo. at 19-20. He brought a buyer to the

---

[9]According to Richmond, Burse and Holt "arrived together" to work at the Trussville Crossings office. Richmond depo. at 12.

construction site and the builder allowed him to sell the property as a listing agent. Burse depo. at 20.

Plaintiffs Burse and Holt work together as a team to sell real estate. Burse depo. at 26-27. This was an agreement reached between the two of them and not arranged by defendant. *Id*., at 27. Plaintiff Burse has spoken with Mary Richmond, David Eubanks and Fran Mize about his desire to become involved in new construction sales. *Id*., at 49. When he first came to the Trussville Crossings office, he told Mary Richmond that one of the reasons he chose that office was for new home construction. *Id*., at 49-50, 52. According to Burse, Richmond replied she would assist him in getting into this area, although she gave him no guarantees. *Id*., at 50, 52. He spoke with her about this on more than one occasion. *Id*., at 54. Eventually, Richmond told him to go find land and a builder. *Id*.

Plaintiff Burse also spoke with David Eubanks, who was on the sales team for the Hidden Ridge subdivision. Burse depo. at 56. Another real estate agent, Fran Mize had found the land and a builder to develop this subdivision. *Id*., at 54-56, 59. From talking to Eubanks, Burse was left with the impression that Eubanks was chosen for the sales team by Mize. *Id*., at 57. Burse asked Mize if he could be on her sales team, but she replied, "No." *Id*., at 62.

11

Plaintiff Burse has also spoken with DeOnna Holt about becoming involved in new construction sales.  Burse depo. at 65.  He had learned she was on the sales team for Carrrington, and asked how he could get on that team.  *Id*., at 66.  DeOnna Holt would not tell him how she got on that team other than to state that she got lucky.  *Id*.  He does know that Sue Isenhower, who is another agent on  the Carrington Lakes team, is married to a builder who has built some of the homes at Carrington Lakes.  *Id*., at 67, 72.  Burse states that only Isenhower sells the homes her husband has built.  *Id*., at 73.   Other than this, Burse has no information about how the agents who are on the sales team at Carrington Lakes achieved that designation. *Id*., at 76-77.  He does not know how agents were selected to be on the Ridgefield sales team either.  *Id*., at 78.

Plaintiff Burse heard about an interview process for sales teams for the Longmeadow and Lakeside areas, but he did not participate because he thought it would be a waste of his time.  Burse depo. at 85-87.  He stated that Scott Underwood, who is a RealtySouth agent and the developer of the properties in question, was making the determinations of who would be on the sales teams.  Burse depo. at 87-88; Richmond depo. at 120.  According to Richmond, the Trussville Crossings office did not get this entire subdivision listing because the purchase of the land by the developer fell through.  Richmond depo. at 96, 120-121.  Underwood had selected

12

three agents to sell these properties, but Richmond had nothing to do with that selection. Richmond depo. at 121.

When asked if the builder had input into who was selling the properties in question, Burse responded that "[a]ll I know is the builder meets with – to my understanding, meets with our broker. And they have a meeting. And the teams meet, or the prospective teams meet. And they have a meeting, and they pick the team." Burse depo. at 91-92. He has determined this from "being in the office and seeing them – seeing them – at least seeing them behind closed doors meet and – with the plans and specs." *Id*., at 92. He does not actually know what happens at those meetings or how individuals get invited to them. *Id*. Burse has never had anyone indicate to him that he was not considered for any of these teams because of his race. *Id*., at 95-96. However, there are no African-Americans on the sales teams in question. *Id*., at 97. Burse admits he has no information about how anyone has ever been selected to be on any new home sales construction team, but then states, "[a]ll I know is that I've never seen a black in new construction in the Trussville area...." *Id*., at 106.

**Charles Anwah**:

Plaintiff Anwah began his real estate career in 1994 with another agency that subsequently merged with the defendant.[10]  Anwah depo. at 12.  He is an independent contractor.  Defendant exhibit 1 to Anwah depo.  Prior to the merger, the office in which Anwah worked closed and moved to the present location of the defendant's Trussville Crossings location.  Anwah depo. at 17; Richmond depo. at 11.

Plaintiff Anwah has never been a listing agent on a new home.  Anwah depo. at 35.  However, he has sold new home construction.  *Id.*, at 36.  He has shown homes in the Ridgefield and Hidden Ridge subdivisions.  *Id.*, at 53-54.  After the merger, he told Mary Richmond that he was interested in selling new home construction.  *Id.*, at 42-43.  She told him it was worth getting into, but involved a lot of sitting at the place, and that it was not for everyone.  *Id.*, at 44.  She also told him that the defendant "gets approached from time to time by people who want to develop properties.  And that, you know, teams are selected.  And if I express interest, I will consider it."  *Id.*, at 45.  She did not tell him how the teams were selected or that he would definitely be on one.  *Id.*, at 46-47.  These conversations occurred in 1999 or

---

[10]Plaintiff Anwah also buys and sells houses and has some rental properties.  Anwah depo. at 28.

2000 and Anwah has not spoken to Richmond about this since.  *Id*., at 48-50.  He has not specifically spoken to anyone else about new home sales teams.  *Id*., at 59.

Plaintiff Anwah had no information concerning how the individuals on the new home sales teams got to be there. Anwah depo. at 54-55. He stated that when he hears of a new subdivision, he hears of the sales team at the same time.  Anwah depo. at 55. He does not know how or when they were selected.  *Id*.  He did hear of interviews being done for the Longmeadow and Lakeside developments.  *Id*., at 55-56.  He was out of the country during the interview process, so he did not participate. *Id*., at 56.

Anwah reached the conclusion he was excluded from new home construction sales because of his race based "on observing the teams he saw."  Anwah depo. at 60. He reached this conclusion sometime after 2002.  Anwah depo. at 61.  However, no one has ever specifically indicated to him that he was not on a team because of his race.  Anwah depo. at 68-69.

He has spoken generally to members of new home sales teams regarding his desire to be on one of those teams, but was told the teams were already formed. Anwah depo. at 63.  He was not given any information regarding how the teams were formed.  *Id*., at 63-64.  He agrees that this lack of information on how to get on a team could be more from a financial motivation than a racial motivation.  *Id*., at 65-66.

According to Richmond, Carrington Lakes was being developed by the Harris Group, which had a long standing relationship with a real estate agent named Ed Cole.  Richmond depo. at 64-65.  Although Cole works for defendant, he does not work out of the Trussville Crossings office.  *Id.*, at 65.  Cole needed help, and Sue Adams, in the Trussville office, "is a legend in our area" and had just moved to Carrington Lakes.  *Id.*, at 67.  While she assisted Cole, she was not a listing agent.  *Id.*  However, over time, Jack Harris, of the Harris Group, became dissatisfied and wanted agents from the Trussville area.  *Id.*, at 69.  Harris came to the Trussville Crossings office and the Trussville Main Street office (also part of defendant) for sales meetings.  *Id.*, at 69-70.  At both offices, he announced that he was inviting agents who had builders who wanted to build at Carrington Lakes to let him know.  *Id.*, at 70.  Sue Adams and Bonnie Hicks of the Main Street office met with Harris, and he told them to form a team.  *Id.*, at 72.  Harris later told them he wanted a sales office open seven days a week at Carrington Lakes, so Adams and Hicks, along with Harris, decided to add agents to the team.  *Id.*  Sue Adams asked the top producing agents in the Trussville Crossings office to join that team.  *Id.*, at 73.  The only input Richmond had was to suggest DeOnna Holt be the seventh person on the team of seven.  *Id.*, at 74.  Richmond thought she would be good on that team and also knew that Holt's father-in-law was a well-known developer.  *Id.*, at 75-76.  Richmond has

16

only suggested a particular agent for new construction sales on one other occasion.

*Id.*, at 107.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986).   As the Supreme Court has explained the

summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence
> of an element essential to that party's case, and on which that party will
> bear the burden of proof at trial.  In such a situation, there can be no
> genuine issue as to any material fact, since the complete failure of proof
> concerning an essential element of the non-moving party's case
> necessarily renders all other facts immaterial.

*Celotex Corp.* 477 U.S. at 322-23.  The party moving for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings which it believes demonstrates

the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to

the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the

'depositions, answers to interrogatories, and admissions on file' designate 'specific

facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed.R. Civ.Pro. 56(e).  In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.Pro.  56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson*, 477 U.S. at 249.  The non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v.  Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. SH. Kress & Co.*, 398 U.S. 144, 157 (1970).  The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 249.  The basic issue before the court on a motion for summary judgment is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-252.

## LEGAL ANALYSIS

Plaintiffs asserts that the above facts constitute race discrimination 42 U.S.C. § 1981, violate §§ 3605 and 3606 of the Fair Housing Act and constitute the state law tort of outrage.

**§ 1981**:

42. U.S.C. § 1981, as amended, prohibits discrimination in making, performing, modification or termination of contracts.   Claims under 42 U.S.C. § 1981 are analyzed using the same substantive proof and framework as claims pursuant to 42 U.S.C. § 2000e. *See e.g., Bass v. Board of County Com'rs, Orange County, Florida*, 256 F.3d 1095, 1109 n. 4 (11th Cir.2001); *Ferrill v. The Parker Group,* 168 F.3d 468, 472 (11th Cir.1999); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998).

To establish a prima facie case of discrimination under § 1981, the plaintiffs must each show that (1) he is a member of a protected class; (2) an intent to discriminate on the basis of race by the defendant; (3) that the discrimination concerned an "enumerated activity." *Baker v. McDonald's Corp*., 686 F.Supp. 1474, 1481 (S.D.Fla.1987), *aff'd* 865 F.2d 1272 (11th Cir. 1988), *cert. denied* 493 U.S. 812,

110 S.Ct. 57, 107 L.Ed.2d 25 (1989).  In other words, to prevail on a § 1981 claim, the plaintiffs must establish that the defendant acted with discriminatory purpose.  *See e.g., Armstrong v. Flowers Hospital, Inc*., 33 F.3d 1308, 1313 (11th Cir.1994).  *See also Ferrill*, 168 F.3d at 472 ("Section 1981 liability must be founded on purposeful discrimination .... A showing of disparate impact through a neutral practice is insufficient...").

Given the facts before this court, the plaintiffs have not shown any intent by the defendant to discriminate against them based on race.  Rather, the undisputed evidence is that agents who bring builders to developers end up with the listings for new home developments.  Further undisputed by the evidence is that agents pick other agents to be on their teams.  Plaintiffs have not stated any claims for discrimination against other real estate agents.  Because the plaintiffs have failed to establish any actions by the defendant from which a discriminatory purpose even could be inferred, the court is of the opinion that the defendant's motion for summary judgment on the plaintiffs' claims pursuant to § 1981 are due to be granted, and shall so rule by separate order.

The plaintiffs argue that, applying a Title VII standard to their claims of race discrimination, they establish a prima facie case.  Plaintiffs' response at 15.  The court has considered this argument, but finds it does not assist the plaintiffs.  Even if the

court used the standard stated by plaintiffs, they cannot establish a prima facie case of race discrimination in the failure to be placed on new home subdivision sales teams because they have no evidence that defendant made these selections.  In other words, any discrimination they allege was not the result of the defendant's actions.[11]

**Fair Housing Act Claims**[12]

The burden shifting standard set forth in *McDonnell- Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is also applicable to cases brought under the Fair Housing Act.  *See Secretary, United States Dept. of Housing & Urban Dev. on behalf of Heron v. Blackwell,* 908 F.2d 864, 870 (11th Cir.1990).

*A. § 3606 Claims*

---

[11]The plaintiffs assert for the first time in their response to defendant's motion for summary judgment that the defendant can be held liable for the actions of its agents.  Plaintiffs' response at 16.  Nowhere have the plaintiffs pleaded that their rights under § 1981 were infringed by other real estate agents.  Rather, the plaintiffs have maintained that the defendant itself discriminatorily assigned agents to list new home subdivisions.

Similarly, the plaintiffs assert that the defendant has failed to establish a legitimate reason for its actions because it did not articulate a reason for its agents' decisions to staff the new construction teams solely with white agents.  Plaintiffs' response at 17.  However, the plaintiffs miss the point.  Richmond testified that, with two exceptions, she has never placed anyone on a sales team.  This would be the defendant's proffered nondiscriminatory reason for its actions.  Had the plaintiffs wanted to prove a "reason for the agents' decisions to staff the new construction teams solely with Caucasian agents," plaintiff's response at 17, they should have provided evidence of the same.  In other words, the plaintiffs could have, but did not, provide the court with any evidence that the other real estate agents intended to discriminate, and that defendant, with knowledge of such intent, allowed the same to occur.

[12]The plaintiffs wholly fail to address these claims apart from their analysis applying a Title VII standard.

21

Section 3606 of the FHA prohibits denying "any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling ... dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race ..."  42 U.S.C. § 3606. Claims under § 3606 of the Fair Housing Act ("FHA") are analyzed using the same formula as detailed above.  *Hall v. Lowder Realty Co., Inc*., 160 F.Supp. 2d 1299, 1313-1314 (M.D.Ala.2001).  Thus, the plaintiffs must first show a prima facie case of housing discrimination.  *Id.*, at 1316.  Under the facts of this case, to make such a showing, the plaintiffs must establish (1) they are members of a protected class; (2) they were qualified to participate in a business related to the buying and selling of houses; (3) they were limited in their access to new home development listings by the defendant; and (4) others not in their protected class were given greater access to new home development listings by the defendant.  *See id.*  The parties do not dispute that the plaintiffs are members of a protected class and qualified to participate in the real estate business.  The parties do dispute whether the defendant had any ability to provide or limit access to listings in new home developments.  The plaintiffs base their claims that the defendant so limited them wholly on conjecture.  In other words, the plaintiffs have not presented any evidence that the defendant, as opposed to other

22

agents, determined who would participate in listing teams for new home developments.  The sole evidence before the court on this issue is that whoever produced builders for developers got the listings in question.

The plaintiffs claim that they were systematically excluded from participating in the listing of new home development listings based on their race.  However, the plaintiffs have produced no evidence that the defendant routinely made decisions in which agents participated on the sales teams of such developments.  Rather, these decisions were a reflection of which agents brought builders and developers together, or which agents routinely teamed up together.  Plaintiffs failed to rebut defendant's evidence that whatever agent found builders for particular developments received the listings for the houses built by those builders.

Additionally, plaintiffs have not established that they were prevented from selling the houses in question, but rather that they did not receive the listing for the houses in question.  However, they have produced no evidence that the defendant, as opposed to the property owner, determined who the listing agent would be.  Having considered the foregoing, and being of the opinion that the plaintiffs have failed to meet their burden of prima facie proof of discrimination, the defendant's motion for summary judgment on these claims shall be granted by separate order.

B. §3605(a) Claims

Under § 3605(a), it is "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race ..." 42 U.S.C. § 3605(a).  Transactions covered by this subsection include the "selling, brokering, or appraising of residential real property." 42 U.S.C. § 3605 (b)(2).  For the same reasons set forth above, the court is of the opinion the defendant's motion for summary judgment on this claim is due to be granted.  The plaintiffs have provided the court with no evidence that the defendant, as opposed to other agents, did not want the plaintiffs on new home community sales teams.

**State Law Claim for Outrage**

To establish a claim for the tort of outrage, under *American Road Service v. Inmon,* the plaintiffs must show conduct so outrageous or severe that no reasonable person could be expected to endure it. *Inmon,* 394 So.2d 361, 365 (Ala.1980).  The Alabama Supreme Court has consistently limited these claims to three types of cases.

> 1) cases having to do with wrongful conduct in the context of family burials, see *Whitt v. Hulsey,* 519 So.2d 901 (Ala.1987) (reckless desecration of family burial ground by adjacent landowner sufficient to present a jury question as to claim of outrage), *Levite Undertakers Co. v. Griggs,* 495 So.2d 63 (Ala.1986) (defendant undertaker's wrongful retention of the remains of plaintiff's husband to force payment of funeral expenses sufficient to present a jury question as to claim of

outrage), and *Cates v. Taylor,* 428 So.2d 637 (Ala.1983) (defendant's withdrawal of permission to use a burial plot 30 minutes before the planned burial sufficient to present a jury question on claim of outrage); 2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim, *National Security Fire & Cas. Co. v. Bowen,* 447 So.2d 133 (Ala.1983); and 3) a case involving egregious sexual harassment, *Busby v. Truswal Systems Corp.,* 551 So.2d 322 (Ala.1989).

*Thomas v. BSE Indus. Contractors, Inc.,* 624 So.2d 1041, 1044 (Ala.1993). The facts in this case simply do not rise to a level of "outrage" as that term has been defined by Alabama state courts. As such, the defendant's motion for summary judgment shall be granted on this count of the plaintiff's complaint.

## CONCLUSION

The court having considered the foregoing, and finding that the plaintiffs have failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial, the court **ORDERS** that the defendant's motion for summary judgment is hereby **GRANTED**. The plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

**DONE** and **ORDERED** this the 28th day of March, 2006.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE